UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

Frank Nali
   Plaintiff

v.

Correctional Medical Services, Inc. (A.K.A. CMS)
Dr. Ivens, Dr. C. Hutchinson, Dr. G. Pramstaller
Dr. Berhane, Dr. Rocco, Dr. Virgillo, Dr. Brady
and Dr. Ayers.

Case No. 2:10-cv-191
Hon. R. Allan Edgar



## AMENDED COMPLAINT

1. Plaintiff is a resident and citizen of Wayne County, Michigan.
2. Defendant, CMS was a corporation contracted by Michigan Department of Corrections to provide health care to inmates, as an independent contractor.
3. CMS main office was located at 12647 Olive Blvd, St. Louis, MO 63141-6345.
4. CMS does not conduct business anymore for the Michigan Dept. of Corrections (MDOC).
5. Defendants, Dr. Ivens, Dr. Hutchinson, Dr. Berhane, Dr. Rocco, Dr. Virgillio and Dr. Brady were all employed by CMS.
6. Dr. Pramstaller is employed by MDOC.
7. At the time of the incidents complained of herein CMS and its employee-doctors conducted business in Michigan. At the present time, it is understood that these defendants do not conduct business for MDOC.
8. This action is initiated under diversity of citizen.
9. The amount in controversy is over $100,000.00 (one hundred thousand dollars).
10. No defendants are immune from the action because of gross negligence, and waiver of immunity.
11. On or about March 6, 2006 while plaintiff was housed at Kinross Correctional

facility, plaintiff slipped and fell on the unprotected icy ground, and when it occurred plaintiff felt his knee or something within his knee snapped. Plaintiff was unable to get up and had to be taken to the health unit by being placed on a gurney and transported by a motorized vehicle.

12. Plaintiff was given a full length immobilizer placed over his left leg and transported to the emergency room at War Memorial Hospital at Sault Ste. Marie.

13. An X-ray of plaintiff's left knee was performed and showed no broken bones.

14. Plaintiff was seen the following day or two by Dr. Berhane at which time plaintiff requested to be seen by a specialist, and to have an MRI done.

15. Plaintiff was seen several more times by Dr. Berhane, and each time plaintiff requested to be seen by a specialist, and to have an MRI done.

16. Dr. Berhane consulted with her supervisor, Dr. Ivens, regarding obtaining an MRI, and a specialist but Dr. Ivens refused to give the permission for either.

17. In order for Dr. Berhane to have obtained permission from Dr. Ivens, she had to inform him of plaintiff's diagnosis and condition.

18. Dr. Berhane failed to properly diagnose plaintiff's condition as only a sprain, although plaintiff insisted that something was torn around his knee.

19. Plaintiff was subsequently transferred to Hiawatha Correctional Facility where Dr. Ayers also refused to have plaintiff evaluated by a specialist, namely an orthopedic surgeon.

20. Dr. Ayers kept telling plaintiff that nothing was wrong with plaintiff's knee inspite of the several complaints of inability to walk properly; no knee reflex on his left knee; inability to extend his left leg; a freely movable left patellar, and obvious signs that part of the muscle in plaintiff's left knee above the patellar, appeared to have disappeared.

21. Eventually, an MRI was done, and it revealed a possible anterior cruciate ligament sprain.

22. Plaintiff informed Dr. Ayers that the MRI results did not explain the signs and symptoms plaintiff expressed, and plaintiff continued to request an evaluation by a specialist - an orthopedic surgeon, and that request was continually denied by Dr. Ayers.

23. Plaintiff wrote letters to defendants Dr. Hutchinson and Dr. Pramstaller, who are the final decision-makers in these matters, explaining plaintiff's condition, and requested to be evaluated by an orthopedic specialist. They never responded.

24. Plaintiff was then transferred to Ojibway Correctional Facility where Dr. Rocco refused to have plaintiff evaluated by a specialist, and he continued to deny anything was wrong with plaintiff's knee, except the possible sprain.

25. Plaintiff was then transferred to Pugsley Correctional Facility where Dr. Virgillio refused to have plaintiff evaluated by a specialist, and failed to diagnose plaintiff's condition as anything but a possible sprain.

26. Then plaintiff was transferred to Adrian Correctional Facility, and he informed Dr. Brady that he needed to be evaluated by a specialist, because the report from the MRI did not 'fit' with the complaints and the signs and symptoms plaintiff had been expressing. Dr. Brady refused to have plaintiff evaluated by a specialist.

27. It is the practice and policy by CMS and MDOC that all special procedures and referrals to specialist must be approved by Dr. Hutchinson, the medical director of CMS, and Dr. Pramstaller, the medical director of MDOC.

28. It was the responsibility of the various facility doctors to make the right diagnosis and make the recommendations to their supervisors and the medical directors.

29. None of the doctors made the right diagnosis.

30. During the period of plaintiff's injury while at the various facilities, plaintiff could not ambulate without the aid of some device, due to the obvious deformity in his thigh muscles around his knee and accompanying weakness and instability.

31. On or about June 28, 2009 plaintiff's conviction was overturned by the federal court, and his immediate release was ordered.

32. Plaintiff was finally able to be evaluated by a specialist who diagnosed plaintiff on or about December 21, 2009 with a 75% quadricep tendon rupture.

33. On or about June 7, 2010 plaintiff saw another specialist, an orthopedic surgeon who confirmed the diagnosis of a quadricep tendon rupture and no anterior ligament sprain.

34. Under the patient-physician relationship that was created when plaintiff was seen by the various defendants, all the defendants had a special duty to plaintiff, to make the proper diagnosis, and to render the proper care and treatment to plaintiff.

35. All defendants breached their duty, by misdiagnosing plaintiff's condition even after plaintiff repeatedly informed them of the need for him to be evaluated by a specialist; that the radiologist's report saying that plaintiff's injury was a sprain, was incorrect. Some of the defendants also knew that plaintiff was a practicing E.R. Physician and family doctor for about 10 years, but chose to disregard plaintiff's request and information, because plaintiff was simply a prisoner to them.

36. Defendants breached their duty by failing to have plaintiff evaluated by a specialist. Any medical resident would have been able to make the right diagnosis and immediately refer plaintiff to a specialist.

37. Defendants failed to render the proper care and treatment to plaintiff which would have been, an immediate evaluation by an orthopedic surgeon, and subsequent surgery.

38. Defendants actions, and/or inactions were reckless with a total disregard for any injury they caused plaintiff.

39. The failure by defendants to make the proper diagnosis, to have plaintiff evaluated by a specialist; and deny him the surgery he needed was malicious.

40. Plaintiff suffered permanent disability to his leg, as a direct and proximate cause of plaintiff's injury, and suffering.

41. Defendants Dr. Hutchinson and Dr. Pramstaller as the final decision-makers knew or should have known that plaintiff's injury together with letters submitted to them by plaintiff, needed special procedures, or in the least, plaintiff should have been evaluated by a specialist.

42. They had a duty to render and gave permission to the defendant doctors to refer plaintiff to a specialist, but they denied plaintiff that opportunity simply for financial reasons.

43. Dr. Hutchinson and Dr. Pramstaller's refusal to 'okay' plaintiff's request to be evaluated by a specialist led to plaintiff permanent injuries.

44. Defendants conduct was wanton and reckless with total disregard for any resulting injury to plaintiff.

45 Governmental immunity does not apply to any defendants because of their gross negligence; and as governmental agency operating a prison, defendants must have liability insurance to cover personal injury and property damage, therefore they have waived their governmental immunity.

46 CMS is also responsible for the actions of its employees.

## DAMAGES

47 Plaintiff incorporates 1 through 46.

48 Plaintiff has suffered permanent damage to his leg, with weakness and instability. Physical pain. Mental and Emotional stress. Financial loss. Inability to obtain gainful employment. Social disengagement, family disassociation, and the inability to pursue a normal existence.

## RELIEF SOUGHT

49 Plaintiff requests judgment in his favor, and an award in excess of $100,000.00, plus punitive and compensatory damages in excess of $100,000.00 plus interest and costs, and any other award deemed necessary.

## DEMAND FOR TRIAL BY JURY

Now comes plaintiff and demands a trial by jury.

Date: 5/31/2011

By: Frank Nali
484 Allard Rd
Grosse Pointe Farms, MI 48236